(75 South. 318)
### GRAY & DUDLEY HARDWARE CO. v. GUTHRIE et al. (6 Div. 465.)

(Supreme Court of Alabama. April 12, 1917. Response to Application for a Rehearing, May 17, 1917.)

1. FRAUDULENT CONVEYANCES ⬅110(1)— MORTGAGES.

Under Code 1907, §§ 4287, 4293, as to conveyances in trust and in fraud of creditors, all mortgages or securities by which the grantor reserves a benefit, or by which the grantee is required to make a release, or to do any act impairing his existing rights, are by that fact rendered void.

[Ed. Note.—For other cases, see Fraudulent Conveyances, Cent. Dig. §§ 352, 355, 356.]

2. CHATTEL MORTGAGES ⬅188(2)—STOCK OF GOODS—CONTINUATION OF USE IN THE BUSINESS.

Where a mortgage is taken on a stock of goods with an understanding that the mortgagor is to continue in business in charge of the goods, necessarily disposing of them from time to time, such mortgage is fraudulent and void as to present and subsequent creditors of the mortgagor.

3. FRAUDULENT CONVEYANCES ⬅23—CHATTEL MORTGAGE—INVALIDATION BY SUBSEQUENT AGREEMENT.

Although a chattel mortgage may be valid on its face, it may be rendered invalid by a subsequent agreement, and though the agreement be in writing, it will then be considered as having entered into the mortgage and formed a part thereof, and if it would have been void in the first instance, it would be void in the second.

[Ed. Note.—For other cases, see Fraudulent Conveyances, Cent. Dig. § 31.]

4. BANKRUPTCY ⬅161(1) — PREFERENCES — TIME OF GIVING PREFERENCE—DATE OF RECORDING.

Where a chattel mortgage upon a stock of lumber of one who became bankrupt was not filed for record four months before the petition in bankruptcy was filed, and by agreement between the parties was withheld from record for the interest and protection of the mortgagor, and probably to the detriment of other creditors, the mortgage was void because within the preferential class prohibited by Bankr. Act July 1, 1898, c. 541, § 60, 30 Stat. 562 (U. S. Comp. St. 1916, § 9644), which provides that where a preference consists in a transfer, the period of four months shall not expire until four months after the date of the recording or registering of the transfer.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 261, 262, 287.]

5. BANKRUPTCY ⬅161(1) — PREFERENCES — TIME OF GIVING PREFERENCE.

Under Bankr. Act, § 60, as to preferences and time of recording preferential transfers, if a mortgage given by one later becoming bankrupt is valid when made and would not create a preference prohibited by the Bankruptcy Act had bankruptcy petition been filed within four months from its execution, then the mere fail-

ure to file for record will not destroy its validity or the lien created thereby.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 261, 262, 287.]

6. BANKRUPTCY &⇒161(1) — PREFERENCES — TIME OF GIVING PREFERENCE.

Bankr. Act, § 60, as to preferences and time of recording transfers, was designed to extend the time within which a conveyance or assignment or preference could be assailed and the property conveyed or assigned subjected as assets for the benefit of all the creditors alike, but it did not make void any mortgage, conveyance, assignment, or preference which would not otherwise have been voidable had it been made within the four months of the filing of a petition in bankruptcy, but had the effect of making the date from which the four months run start from the recording or filing for registration, rather than from the date of its execution.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 261, 262, 287.]

Response to Application for a Rehearing.

7. CHATTEL MORTGAGES &⇒201(2)—USE OF PROPERTY BY MORTGAGOR—EVIDENCE.

In a suit to foreclose a mortgage on stock of goods, attacked as fraudulent, evidence *held* to show that the mortgaged property was intended by both parties to be used in the mortgagor's business.

[Ed. Note.—For other cases, see Chattel Mortgages, Cent. Dig. § 360.]

Appeal from Chancery Court, Cullman County; James E. Horton, Jr., Chancellor.

Suit by Gray & Dudley Hardware Company against W. L. Guthrie, as trustee, and others. From decree for respondents, complainant appeals. Affirmed.

E. W. Godbey, of Decatur, for appellant. Sample & Kilpatrick, of Cullman, for appellee.

MAYFIELD, J. Appellant corporation filed its bill in the chancery court of Cullman county to foreclose a mortgage executed by Charles Ruehl on the 12th day of June, 1914, but which was not filed for record until September 3, 1914. The mortgage was to secure the payment of a note for $1,660.73, maturing the 1st of August, 1914, and any other indebtedness which might thereafter accrue or exist, before the maturity of the debt or the enforcement of the mortgage; but none, other than the note mentioned, was shown to have accrued, so the mortgage was given in effect to secure an existing indebtedness. There was, however, an agreement between the parties to the mortgage that if the mortgagor should assign and deliver to the mortgagee notes of third parties to the amount of $2,000 on or before the maturity of the note secured—that is, before August 1, 1914—the mortgage should thereupon be treated as surrendered or satisfied, and the debt secured, extended until November 10, 1914. The bill was filed against the mortgagor, who had then become a bankrupt, and W. L. Guthrie, as his trustee in bankruptcy, and several creditors of the bankrupt mortgagor, who were also mortgagees of the bankrupt.

The bill sought to have complainant's mortgage foreclosed and certain other mortgages declared void as against complainant. The trustee answered the bill, and made his answer a cross-bill seeking to have complainant's mortgage declared void as to the creditors of the bankrupt mortgagor, because there had been an attempted preference, in violation of the Bankruptcy Act, and because the mortgage was made also with intent to hinder, delay, or defraud the other creditors of the mortgagor. The chancellor denied to complainant any relief, as prayed or otherwise, but granted the relief prayed in the cross-bill of the trustee in bankruptcy. From the decree the complainant prosecutes this appeal.

The main question presented on this appeal for decision, that upon which most of the others depend, is whether or not complainant's mortgage, sought to be foreclosed, was void as against the existing creditors of the mortgagor, by virtue either of the bankruptcy statute or of our state statutes as to fraudulent conveyances. If void for any reason, or by virtue of any statute, state or federal, then of course complainant was not entitled to no relief, that prayed or otherwise; if not void, but valid, then it was entitled to at least part of the relief prayed. We are of opinion that the chancellor reached the correct conclusion, and rendered a correct decree, so far as the complainant has any cause to complain.

While the mortgage was executed more than four months before the bankrupt filed his petition of bankruptcy, in the bankruptcy court, upon which he was subsequently adjudicated a bankrupt, yet by agreement it was withheld from record, to a time, September 3, 1914, within four months of the filing of the petition, and also by agreement it was not to be absolutely binding as a mortgage, even between the parties, until August 1, 1914, which was within four months. Moreover, the mortgage was upon a stock of lumber and materials which the mortgagor was using in his business, and which he continued to so use after the execution and the law day of the mortgage. While there is some evidence tending to show that the mortgagee assumed some sort of custody or control of the mortgaged property, it was not possession such as other creditors or the public would notice, or such as would charge them with notice. There was no removal, or actual change of the custody or control of the property, merely a marking or branding of some of it with initials or other marks to indicate that it was the property of the mortgagee.

The evidence satisfies us, however, as it did the chancellor, that there was no actual change of the possession, custody, or control of the mortgaged property, but that it was left in the custody and control of the mort-

gagor, with the right to use it in the business just as it had been theretofore used; and that some of it was actually so used; and that the mortgagor's employés had no knowledge or notice of any claim to the possession of the property so used.

[1] All mortgages or securities by which the grantor reserves a benefit, or by which the grantee is required to make a release, or to do any act impairing his existing rights, are by that fact rendered void. Code, §§ 4287, 4293.

[2] Where a mortgage is taken on a stock of goods with an understanding that the mortgagor is to continue in business in charge of the goods, necessarily disposing of them from time to time, such mortgage is fraudulent and void as to present and subsequent creditors of the mortgagor. Gillespie v. McClesky, 160 Ala. 289, 49 South. 302. The following authorities are to the same effect: Benedict v. Renfro, 75 Ala. 121, 51 Am. Rep. 429; Owens v. Hobbie, 82 Ala. 467, 3 South. 145; Bank v. Eborn, 84 Ala. 529, 4 South. 386; Woodall v. Kelly, 85 Ala. 368, 5 South. 164, 7 Am. St. Rep. 57; Murray v. McNealy, 86 Ala. 234, 5 South. 565, 11 Am. St. Rep. 33; McDermott v. Eborn, 90 Ala. 258, 7 South. 751; Pugh v. Harwell, 108 Ala. 486, 18 South. 535.

[3] Though a mortgage may be valid on its face, it may be rendered invalid by a subsequent agreement, and though the agreement be in writing, it will be then considered as having entered into the mortgage and formed a part thereof, and if it would have been void in the first instance, it would be void in the second. Roden & Co. v. Norton & Co., 128 Ala. 137, 29 South. 637; Birmingham Co. v. Roden & Co., 110 Ala. 511, 18 South. 135, 55 Am. St. Rep. 35; Stephens v. Regenstein, 89 Ala. 561, 8 South. 68, 18 Am. St. Rep. 156; Tryon v. Daimwood, 80 Ala. 321.

We are of the opinion that the evidence in this case shows that the mortgagor was allowed to remain in possession of, and to use, the property after the law day, and that by such an agreement the mortgage was withheld from record after it was known by both parties that the mortgagor was insolvent or in failing circumstances. We know of no reason why a different rule should apply, as to a mortgage on an ordinary stock of merchandise, usually kept in stores, from the rule as to a mortgage, as in this case, on a stock of lumber and timber which has been used, and is continued to be used, in the business of manufacturing wagons, buggies, etc., and selling the same, by the mortgagor in the usual course of business.

We are also of the opinion that both parties believed that the mortgagor was in failing circumstances when the mortgage was executed, and were confirmed in, or convinced of, such fact when the mortgage was recorded. While neither may have been absolutely sure or certain that the mortgagor did not then own property or assets sufficient to pay all

his debts, we are satisfied that both parties apprehended insolvency, and that the mortgage was intended to provide against what was thereafter actually made certain, that the mortgagor was insolvent, and to assure that the mortgagee should be thereafter preferred over other creditors, when settlement should be had among the creditors in the bankruptcy proceedings. Section 60 of the Bankruptcy Act provides in part as follows:

"Where the preference consists in a transfer, such period of four months shall not expire until four months after the date of the recording or registering of the transfer, if by law such recording or registering is required."

[4] We hold that the evidence in this record clearly brings the mortgage in question within the preferential class prohibited by this section of the Bankruptcy Act. The law requires such mortgages to be recorded, to be valid as against certain persons, claims, or creditors, whereas this mortgage was not filed for record four months before the petition in bankruptcy was filed, and by agreement between the parties was withheld from record for the interest and protection of the mortgagor, and probably to the detriment of other creditors.

[5] If the mortgage in question was valid when made, and would have created a preference among creditors, such as prohibited by the Bankruptcy Act, had the petition been filed within four months from its execution, then the mere failure to file for record would not destroy its validity or the lien created thereby.

[6] The effect and object of the amendment of the Bankruptcy Act, as above set out, was to extend the time within which the conveyance or assignment or preference could be assailed, and the property conveyed or assigned subjected as assets for the benefit of all the creditors alike, thereby avoiding the preference. It did not make void or voidable any mortgage, conveyance, assignment, or preference which would not otherwise have been voidable had it been made within the four months of the filing of the petition of bankruptcy; but it did have the effect to make the date from which the four months should be reckoned start from the recording or filing for registration, rather than from the date of execution, though whether the transaction in question was void or voidable must be ascertained from the facts and circumstances existing at the date of execution, rather than from those obtaining at the date of the filing for record. The federal court has thus construed the object and effect of the amendment above quoted, relied upon by the chancellor:

"It would formerly have been an easy matter to make a preferential transfer prior to the beginning of the four-month period, and withhold the transfer instrument from record until after the period had begun to run, thus defeating the benefit contemplated by the creation of that period. Manifestly Congress must have construed the law as it then stood as making the transfer to date from the time it was actual-

ly made, without regard to the date of filing for record. Therefore a transfer, though fraudulent, could not have been attacked, even though the instrument evidencing the transfer were recorded within the four months. In order to cure this, the amendment was added, so that no fraudulent transfer constituting a preference could escape the four-month provision unless the recording was effected prior to that period." In re Sturtevant, 188 Fed. 196, 110 C. C. A. 68, 26 Am. Bankr. R. 574, 577.

We hold that the mortgage in question was void or voidable when made, as well as when filed for record, and that the parties could not avoid the law by agreeing to withhold, and actually withholding, the mortgage from record. To prevent it from being assailed by virtue of section 60a of the Bankruptcy Act as last amended, it should have been recorded or filed for record four months before the filing of the petition for bankruptcy.

We deem it unnecessary to further discuss this question or any others, as in no event or view of the record is appellant entitled to any relief.

Affirmed.

ANDERSON, C. J., and MAYFIELD, SOMERVILLE, and THOMAS JJ., concur.

Response to the Application for a Rehearing.

Counsel for the application prefaces his brief with the following statement:

"Re: An opinion stressing failure to record a mortgage where no subsequent creditors were shown; an opinion sustaining a recovery by a bankrupt's trustee when no debts were shown to have been proven in bankruptcy; an opinion holding the use by the mortgagor of mortgaged lumber was intended, though both parties swore to the contrary, and holding, also, that a privilege for payment in customer's notes on the law day rendered the mortgage ineffective until the law day."

We regret that the opinion should have misled counsel as to what is decided in this case. It is not decided in this case that the mere failure to record the mortgage renders it void as to existing creditors; nor, as we read the opinion, does it say so, obiter dictum or otherwise. We did not seek to ascertain whether there was, or was not, a subsequent creditor, because, under the facts as found by us and by the chancellor, it was void as to some of the existing creditors, and, moreover, was intended or attempted as a preference to the mortgagee creditor, in violation of the Bankruptcy Act.

As we read the evidence, it was conclusively shown that it was agreed between the parties, when the mortgage was executed, that it should not be recorded, because recording it would injure the credit of the mortgagor—that is, prevent his obtaining further credit—and would cause the existing creditors of the mortgagor to proceed against him to collect their debts, and prevent his obtaining an extension of the time of payment of his existing indebtedness. The mortgage, by its very words, and according to the undisputed parol testimony, was not to be effective as a mortgage until within four months of the bankruptcy proceeding, although it was dated more than four months before the filing of the petition of bankruptcy. In other words, the mortgage in name was not a mortgage in fact or in law, until within four months of the bankruptcy, and therefore, both as a matter of law and a matter of fact, the mortgage was an attempted preference, in fraud of the Bankruptcy Act.

[7] We cannot agree with counsel that this record shows that both parties swore the mortgaged lumber was not to be used by the mortgagor; we find it to show that when the mortgage was signed, and until very shortly before it was recorded, it was intended that such lumber should be used in the business. It was in fact so used, and no objection was made to the use until the mortgagee, over the protest of the mortgagor, decided to have the mortgage recorded. Then, and not until then, was the use of the lumber by the mortgagor prevented. The very nature, as well as the necessary result, of the agreement, was to this effect. The instrument was not to have the effect of an absolute mortgage until shortly before recordation. It was a mortgage, substantially, of the mortgagor's stock in trade; it was not expected that he should suspend business, but that he should go on with it, and use the property, which he did; and appellant's agents, who had knowledge of the facts, swear that it was so agreed, and that the property was accordingly used.

We here set out some of this evidence:

Deposition of H. T. Hill, appellant's assistant treasurer:

"Mr. Jenkins told me that he agreed not to place the mortgage on record until a certain time, and it was in accord with that agreement that the mortgage was not recorded until September 3, 1914." Rec. p. 56.

Deposition of J. T. Jenkins, appellant's general credit man, who took the mortgage in question:

"We did not put the mortgage on record until the date he was to substitute the notes, and he failed to do so. That was one of the reasons we did not have it recorded, because we agreed with him not to do so." Rec. p. 66. "I withheld this mortgage from record at the request of Mr. Ruehl, and finally on the 3d day of September, I got his permission to record it." Rec. p. 102.

Deposition of Charles Ruehl:

"Q. Now at the time this mortgage was given it was agreed that this mortgage was not to be recorded? A. Yes, sir. Q. What statement was made as to why it would not be recorded? A. I was afraid my creditors would jump on me. Q. Did you tell Mr. Jenkins that? A. I did. Q. At the time he came down in September and had the mortgage recorded, what was said about it then? A. He insisted on having it recorded; said if it was not recorded it would not be legal, but would be void. Q. Did you tell him then what your condition was? A. I told him I was afraid everybody was going to jump on me right straight; that if everybody jumped on me I would have nothing to do but go to the wall or go in bankruptcy, and I said if they

jumped on me then it would break me up right then. He said he did not think they would do anything, and he further said he did not think anybody would find it out, and as far as hurting me was concerned, he said he did not think it would be any such thing. The mortgage was then put on record." Rec. p. 115.

"There was no indebtedness created or contracted for at the time the mortgage I described was given to secure his indebtedness, but some of it was not due at that time. Most of the indebtedness had been due for several months. A large portion of it was past due. The first part of it was due about January, 1913. We had been carrying a part of the indebtedness for a year, and a half." Deposition of H. T. Hill, Rec. p. 57.

"This mortgage was given to secure past-due indebtedness solely. * * * Most of the indebtedness for which it was given was long past due." Deposition of J. T. Jenkins, Rec. p. 67.

"I told Mr. Jenkins that I did not want the mortgage to go on record, and if it did I would not sign it." Deposition of Charles Ruehl, Rec. p. 120.

"This mortgage was on lumber which I used in connection with my manufacturing business; used to build wagons. It was on my yard and being used for that purpose. Mr. Jenkins, I suppose, knew that it was going to be used for that purpose, at the time he took the mortgage. We talked about it. I told him that I would use it in making wagons at my plant. I used some of the lumber for that purpose." Deposition of Chas. Ruehl, p. 116.

"Out of one of the piles they used one piece, and I noticed that they used some hickory out of another pile, probably 30 or 40 pieces." Deposition of Chas. Ruehl, p. 117.

"I had been working for Charles Ruehl something over two years when he filed his petition in bankruptcy. * * * His business was the manufacture of wagons, and the sale of wagons, buggies, and blacksmithing. He sold wagons that he manufactured, and bought buggies wholesale and sold them. I was acquainted with his stock on hand, his raw material and wagon material. * * * The property embraced in the mortgage executed to Gray & Dudley Hardware Company was never actually in their possession. The property was permitted to remain in the same place, in connection with the other property, on his premises, in the same manner as it did before that. There was no visible marks on the property to identify it from other property, not that I ever saw. We went on with the work just as though this mortgage had not been given. I have never examined the property to see if the cross-marks and initials 'J. T. J.' were put on it where it was visible. I did not know that they were ever put there until to-day. From the description of the property in the mortgage and my acquaintance with the property as it was, I could not go out and pick out these various stacks on the yard. I do not think I could pick out the stacks and identify them from the others. I was well acquainted with the stacks. The lumber on the yard and the stacks was being used constantly for the manufacture of wagons from the time of the execution of the mortgage up until the bankruptcy. It was used in the same manner as before the mortgage was given. This material, as is described in the mortgage, was used by Mr. Ruehl in the manufacture of wagons along as it was needed in the business. Whenever we needed lumber in manufacturing wagons we went out and got it from the stacks containing what we wanted. * * * There were no particular stacks upon which the Gray & Dudley Hardware Company had a mortgage upon that we were not to use from, none whatever. We sold the wagons that were made in the usual course of business." Deposition of Guthrie, Rec. pp. 70, 71.

"This mortgaged property was just such as they used in the manufacture of wagons and buggies. They were large stacks. He was manufacturing wagons and buggies at that time, and selling them. It was the principal business he carried on. This indebtedness was contracted principally for material furnished for the manufacture of wagons and buggies.' I presume that this lumber that was included in the mortgage was such as was used in the manufacture of wagons and buggies. I knew that he had this material there for this purpose. I did not count the number of pieces in each stack; it was just estimated * * * I have no idea how much lumber was there on the yard, except there was two or three times as much as was in these stacks that Mr. Ruehl pointed out to me. I do not know how long this lumber had been on the yard, and I do not know how long it was on the yard after the mortgage was given. I did not see tags put on the lumber." Deposition of J. T. Jenkins, Rec. pp. 66, 67.

"Q. Now this lumber that was included in this mortgage was used by him in the manufacture of wagons and vehicles? A. Yes, sir. Q. And it was such lumber as he was using at the time? A. Yes, sir; it was left in his possession, on his yard." Deposition of J. T. Jenkins, Rec. p. 100.

We are not of the opinion that this decision is contrary to any of our former decisions, being of the view, rather, that it is in entire accord with the line. As supporting this view, we quote from several cases:

In the headnotes to the report of the case of Lehman, Durr & Co. v. Van Winkle & Co., 92 Ala. 443, 8 South. 870, which furnish a proper statement of the decision, it is said:

"A mortgage which is purposely withheld from record, lest it might injure the mortgagor's business and credit, is fraudulent and void, not only as against subsequent creditors dealing with the mortgagor, but as against an existing creditor who, in ignorance of it, waived a prior lien on the property, or surrendered any other valuable right."

In the case of Christian & Craft Grocery Co. v. Michael & Lyons, 121 Ala. 84, 88, 25 South. 571, 573 [77 Am. St. Rep. 30], it is said:

"It is evident from the terms of the mortgage and the course and conduct of dealing between the claimant and the defendant mill company that it was the intention and understanding of the parties to the mortgage that the mortgagor, mill company, should continue in the possession of the property mortgaged, manufacturing timber and lumber from logs and selling the same for its, the said mill company's, account and benefit. Such was a reservation of benefit to the mortgagor, and it is immaterial whether it appeared in the face of the instrument, or was by a private understanding and agreement between the mortgagor and mortgagee, as to creditors of the mortgagor, the result would be the same. Such being true, the instrument was thereby rendered void as against the existing or subsequent creditors of the defendant mill company under the influence of section 2150 of the Code. Pugh, Stone & Co. v. Harwell & Clark, 108 Ala. 490 [18 South. 535]; O'Neil v. Birmingham Brewing Co., 101 Ala. 388 [13 South. 576]; McDermott v. Eborn, 90 Ala. 260 [7 South. 751]; Murray, Dibrell & Co. v. McNealy, 86 Ala. 234 [5 South. 565, 11 Am. St. Rep. 33]; Owens v. Hobbie & Teague, 82 Ala. 467 [3 South. 145]; Benedict, Hall & Co. v. Renfro & Co., 75 Ala. 121 [51 Am. Rep. 429]."

Counsel for appellant surely overlooked much of the evidence, in saying and concluding that both parties swore to the contrary

of the proposition that the use of the mortgaged property by the mortgagor was intended. The evidence quoted above shows counsel to be in error, if this record correctly sets out the testimony. And there are four copies of the record on file, each containing what we have set above, besides many other facts and circumstances showing that it was understood and agreed and intended by both parties that the mortgaged property should be so used by the mortgagor—just as if no mortgage had ever been executed. The mortgagor testified (Record, p. 116) that the lumber mortgaged was being used in the mortgagor's business, and that the mortgagee's agent, who procured and accepted the execution of the mortgage, knew these facts: That the two discussed the matter, and that witness told this agent about witness' so using the lumber, that witness never agreed not to so use it, and that nothing was said about using it, or not using it, until two months after the mortgage was executed, and until after witness had failed to put up the collateral.

How it can be said, with this evidence in the record, that both parties testified that it was not intended that the mortgaged lumber should be so used is beyond our comprehension.